## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GREGORY JOSEPH NEIFERT,** | : | **Civil No.  3:24-CV-866** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,**[1] | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

In the latest chapter of this Social Security case, we hope to finally give closure to the claimant, who has been pursuing this period of disability benefits for nearly a decade. Gregory Neifert appeals, for the third time, from an adverse decision by a Social Security Administrative Law Judge (ALJ) which denied his closed period claim for disability benefits. This case has been twice remanded by this Court on issues which did not necessarily hinge on the quantum of evidence supporting the ALJ's decision in the longitudinal medical record but rather found flaws in the ALJ's

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

development of the record and articulation of the decision to deny benefits.[2] (Tr. 1617-35, 1972-81).

Neifert suffered from a single medically determinable impairment, traumatic brain injury or TBI, from falling on ice in December 2012. He testified that his brain injury affected his memory, concentration, and ability to deal with people. (Tr. 59, 64). Physically, his examinations were largely unremarkable despite ongoing issues with balance for which he sought treatment throughout the relevant period. (Tr. 1295-1433). Thus, Neifert's symptoms from his brain injury were primarily cognitive with the exception of his balance issues. Despite his injury, the plaintiff returned to work shortly after the accident and continued to work around thirty hours per week in his autobody shop throughout the relevant period and beyond, although he testified that he could no longer perform the same range of work he had previously performed due to his reduced memory and inability to deal with people.

---

[2] The previous ALJ decision was remanded by the Court because it indicated that the claimant was capable of performing work at all exertional levels, but later stated he was only capable of work at the sedentary level. As the plaintiff points out, the residual functional capacity (RFC) in the most recent decision is identical to the previous RFC, but the ALJ has removed any internal inconsistency regarding the plaintiff's ability to only perform sedentary work. In first remanding the case in 2020, the Court concluded the ALJ erred in allowing Neifert to proceed *pro se* despite a clear inability for him to represent himself in the proceedings. He has since retained counsel.

Against this backdrop, the ALJ in this case issued a third decision denying Neifert benefits for the closed disability period between December 7, 2012, and June 30, 2016. The ALJ concluded that Neifert was capable of performing a full range of work at all exertional levels, but with certain postural and mental limitations to account for the residual symptoms from his traumatic brain injury. In doing so, the ALJ relied on Neifert's ability to perform his activities of daily living independently, including continuing to work at his autobody shop, and gave significant weight to the opinion of Dr. Andrew Freese, who conducted a thorough neurological examination of the plaintiff and concluded that, while he had issues with neurological deficits including memory, balance, and personality issues, "the perception of his dysfunction is greater than the realty." (Tr. 1559). Conversely, the ALJ afforded little weight to the opinion of a recent treating source, Dr. John, issued more than four years after the relevant disability period, who opined Neifert would be unable to sustain full-time work.

Neifert has now appealed this third ALJ decision, arguing that substantial evidence does not support the decision of the ALJ since no medical opinion of record supports the ALJ's RFC assessment and there was no medical opinion with regard to Neifert's physical abilities which would support the determination that he can perform work at all exertional levels. With respect to these substantive allegations

3

of error we are enjoined to apply a deferential standard of review, a standard of review which simply asks whether there is "substantial evidence" supporting the Administrative Law Judge's (ALJ) determination. With respect to this legal guidepost, as the Supreme Court has explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we conclude that substantial evidence supported the ALJ's findings in this case. Therefore, for the

4

reasons set forth below, we recommend that the district court affirm the decision of the Commissioner.

## II.    Statement of Facts and of the Case

### A. Introduction

Nearly ten years ago, on February 9, 2016, Gregory Neifert filed a Title II application for disability insurance benefits, alleging an onset of disability beginning December 7, 2012. (Tr. 98, 107). In this application Neifert alleged that he was disabled due to traumatic brain injury. (Tr. 98). Neifert was born on August 15, 1961, and was 51 years old at the time of the alleged onset of his disability, making him an individual closely approaching advanced age under the Commissioner's regulations. (Id.) He had at least a high school education and was employed as an auto technician and autobody repairer. (Tr. 1918).

### B. Neifert's Employment History and Activities of Daily Living

Neifert testified that he had always been self-employed and owned his own body shop since the 1990s. (Tr. 55-56). Following the accident, and throughout the disability period, Neifert continued to work about thirty hours per week in his auto body shop. (Tr. 67). He was also independent in many of his activities of daily living. As the ALJ explained:

> The claimant reported that during the relevant time period, he worked
> thirty hours a week as a mechanic at his own body shop, went to car

5

auctions to purchase cars for his friend's business, drove, including an hour each way to and from therapy once a week, took care of his personal needs, shopped in stores for groceries, managed his finances, performed household chores, and used a computer (to search for things that were for sale, even though he did not use a computer for social media purposes) and smart phone (Exhibit 6E and Hearing Testimony 11/5/18 and 5/5/21). At the current hearing, the claimant testified to being able to drive during the relevant period and that he had lifted cans of paint. The claimant denied he currently goes to car auctions or is working in a car garage, but when asked if he still helps out around the garage, he replied "no, not really", which shows the claimant may be still engaging in some continued activities there.

(Tr. 1915).

## C. Neifert's Clinical History

In December 2012, Neifert suffered a traumatic brain injury after slipping on ice at a gas station. As the ALJ summarized:

The record establishes the claimant was hospitalized from December 7, 2012, through December 17, 2012, and subsequently underwent physical, occupational, and speech therapy from December 17, 2012, through December 22, 2012, due to a traumatic brain injury that occurred after he slipped and fell on ice at a gas station and hit his head (Exhibits 1F through 13F). An MRI of the claimant's brain upon presentation to the emergency room on December 7, 2012, noted that the claimant had an acute subdural hemorrhages, contusions, a fractured right temporal lobe, a non-displaced fracture of the right lamboid suture, a non-displaced fracture of the floor of the greater sphenoid wing, and a non-displaced fracture of the left frontal bone (Exhibit 1F/784). At the time of discharge from his five-day inpatient rehabilitation stay, it was noted he "was making significant improvements in PT and OT," and his "balance improved where the patient did not require any Antivert," and while it was "recommended the [claimant] stay until 12/29 ... he insisted on discharge home as soon as possible" (Exhibits 1F/733 and 2F/4). It was noted he was "no longer

exhibiting word-finding deficits at conversation level and is mod I for auditory/reading comprehension and verbal written expression" (Exhibit 1F/737).

(Tr. 34-36). He was discharged on December 22, 2012, into his mother's care with a rolling walker due to occasional loss of balance. (Tr. 1078). By January 31, 2013, Neifert had returned to work without difficulty and stated he felt his memory was close to baseline and his balance had significantly improved. (Tr. 1100). He stated he did not need any further therapies and remained independent in all function, although he was still living with his mother. (Id.) A physical examination revealed good short-term memory, full orientation, functional range of motion and full strength in his extremities, ability to walk in a straight line and stand on one leg bilaterally. (Id.)

In February and March 2013, he reported having residual symptoms including headaches, short-term memory loss, confusion, coordination issues, and loss of smell. (Tr. 1102-1104). Imaging studies showed no residual hemorrhage and normal appearing intracerebral structures and his physical and neurologic examinations were unremarkable. (Tr. 1104). He was counseled on the natural history of recovery from concussions and encouraged to slowly return to normal level of activity. (Tr. 1102). He was medically approved to resume driving. (Tr. 1099).

At a March 2013 cognitive assessment, though he reported difficulty with his short-term memory, he also stated he was able to independently manage his finances and his business buying and selling cars. (Tr. 1173). He scored within normal limits in executive functioning and concentration, but his memory was moderately impaired. (Tr. 1174). He was assessed as having a mild cognitive impairment secondary to traumatic brain injury (TBI). (Id.) He was referred for physical and cognitive therapy from March through June 2013 for treatment of his concussion. (Tr. 1139-1281). He noted mostly having cognitive trouble, (Tr. 1134), but his balance issues appeared to be improving. (Tr. 1142, 1149). In fact, in April 2013 he reported working all day repairing his car and spending time on his computer, (Tr. 1147), and stated he was not having as much trouble walking on uneven surfaces. (Tr. 1157). In May 2013 he reported he "[w]ent up on a ladder, went on a roof, cut grass, and weed whacked." (Tr. 1162). Nonetheless, he expressed frustration that he was not back to how he was prior to the accident. (Tr. 1164). By the beginning of June 2013, Neifert reported feeling he was approaching 90% of his prior level of cognitive function, though the assessment showed some mild cognitive impairment with working memory, thought organization, planning, and multitasking. (Tr. 1270). Though he reported being fearful about being done with rehabilitation, he was in

agreement to being discharged at the end of June, stating he has had about 90% return of function. (Tr. 1279).

In November 2014 Neifert was referred to ReMed for outpatient therapy through the Pennsylvania Department of Health's Head Injury Program, which also provided quarterly reports. At intake, he reported continued symptoms of vestibular dysfunction, including dizziness and difficulty walking a straight line, although he was able to ambulate independently. (Tr. 1298). He reported being grouchy but without anger dyscontrol, and that he had been able to return to auto body work and could handle daily functions independently. (Tr. 1299). Nonetheless, he continued to report short-term memory loss and difficulty multitasking, although he claimed his concentration, attention, and word-finding abilities were intact. (Id.)

Cognitive testing in February, March, and April 2015 showed low average IQ, average concentration and working memory, but extremely low scores in some areas of short-term memory and problem solving. The examiner summarized:

> Mr. Neifert's cognitive skills range from Extremely Low to Above Average. His performance was lower on many measures of speed of processing, especially as the task complexity increased; on some measures of learning and memory; and on tests of problem solving that require more abstract and flexible thinking. He exhibited variable performance on tests of attention and concentration, Low Average performance on tests of verbal skills, Average to Low Average visual-spatial skills, and Average performance on academic skills of reading and arithmetic. He perceives himself as experiencing significant deficit

9

> across many areas of cognitive and behavioral functioning. The deficits
> he perceives are greater than those demonstrated on testing.

(Tr. 1329). Thus, while these tests revealed some mild cognitive impairments, as had been noted throughout his medical history since his accident, even the treating examiners opined his perception of his impairments outweighed the reality. Moreover, as one examiner also noted, "Mr. Neifert does not use strategies to compensate and displays little understanding about the benefits of strategy use." (Tr. 1320). For example, Neifert admitted he was "stubborn" and did not use a cell phone calendar or other strategies to compensate for barriers because "that's cheating," (Tr. 1316-17), and his coping skills were described as limited. (Tr. 1333). He reported continuing to work as an autobody mechanic, (Tr. 1334), though did describe some limitations in his abilities, reporting his "repertoire of work-related knowledge has decreased since injury. . . looks up information on internet, forgets information by the time he gets from computer to garage." (Tr. 1309).

Neifert was discharged from the Head Injury Program in February 2016. At the time he reported managing both his and his mother's finances. (Tr. 1348). His mother and brother expressed concerns regarding his irritability and reduced frustration tolerance at home, but it was noted this behavior was not observed during his therapy sessions. (Tr. 1350). Recommendations included continued use of compensatory memory strategies, including using his phone calendar and notes app

planning the following day in advance, taking regular breaks or rests through the day, and practicing mindfulness. (Tr. 1351-52).

In February 2016, Neifert was examined by Dr. Ann Malantic Lin. (Tr. 1447). He continued to report difficulty walking a straight line and noted "lack of patience" that he admitted existed prior to his injury but stated had worsened since that time. (Id.) He reported living alone, being able to drive, and being independent in his activities of daily living, and continuing to work in his body shop. (Tr. 1447-48). He was able to ambulate independently without an assistive device. (Tr. 1448). A Mini-Mental Status Exam was performed, and he scored 25/30. (Id.) He stated that he was not interested in continuing with any therapies and was instructed to follow up if there was a functional decline. (Id.)

Neifert also saw consultative examiner Dr. Andrew Freese, on February 4, 2016. Dr. Freese examined the plaintiff, reviewed his medical records, and completed a comprehensive report of the plaintiff's condition. Dr. Freese's examination revealed that Neifert was fully oriented, with slightly slowed but fluent speech, intact judgment, and appropriate affect. (Tr. 1551). He could not recall presidents prior to George W. Bush and could only remember 1/3 items after 5 minutes. (Id.) He had no focal motor deficits in his extremities, intact sensation, but mild problems with tandem gait. (Id.) He reported continuing to work but with some

11

diminished work capacity. (Tr. 1551). Dr. Freese concluded that, although he made significant progress since his injury, he still experienced both physiologic and psychologic symptoms of his injury. (Tr. 1559). But, similarly to other providers, Dr. Freese noted that, "it appears that his perception of his dysfunction is greater than the reality, but he has clear-cut issues with respect to short-term memory, anosmia and loss of sense of taste, some balance issues, and some personality issues." (Id.) He characterized Neifert's cognitive and short-term memory issues as "relatively mild" but concluded that they were permanent. (Tr. 1560). Indeed, in May of 2016 his primary care physician noted his traumatic brain injury was "stable" with no new symptoms. (Tr. 1518).

### D. **Medical Opinions**

When evaluating Neifert's disability claim, the ALJ considered this clinical record and Neifert's self-reported activities of daily living but also assessed an array of medical opinions from state agency experts,[3] an examining consultative source, a

---

[3] The state agency consultant opinions at the initial review level were unhelpful. A state agency psychological consultant, Dr. Roger Fretz, reviewed Neifert's medical records during the relevant period and concluded there was insufficient evidence to make a decision regarding his TBI. (Tr. 102). In the same disability determination, a "single decision-maker" or SDM, not considered an appropriate medical source, opined that Neifert was only physically capable of performing light work.

treating physician, and various statements from other treating sources throughout the record that the ALJ considered as opinion evidence.

The most comprehensive medical opinion issued during the relevant period in terms of Neifert's functional abilities was that of consultative examiner Dr. Freese. Dr. Freese opined on Neifert's abilities in July 2016 after examining him in February and reviewing his medical records and concluded that Neifert's relatively mild cognitive impairments were permanent and that he had reached maximum medical improvement from his injury. (Tr. 1560). However, Dr. Freese also opined that Neifert's limitations and restrictions were related to what he can accomplish and "fortunately he has a job that allows him to function independently, and he appears to be coping reasonably well with it." (Id.) Moreover, as previously noted, Dr. Freese concluded that, "it appears that his perception of his dysfunction is greater than the reality, but he has clear-cut issues with respect to short-term memory, anosmia and loss of sense of taste, some balance issues, and some personality issues." (Tr. 1559).

The ALJ also considered statements by two of Neifert's treating therapists and a treating physician as opinion evidence. The ALJ considered a February 2016 statement by Dr. Malantic Lin that Neifert was independent in ambulation without an assistive device and could drive independently. (Tr. 1448). He also considered a November 2014 statement by treating therapist Dr. McLaughlin that Neifert was

13

"able to return to work doing body work and can handle basic day to day functions . . . he is self-employed in two capacities: he buys cars from a dealer's lot and does autobody work." (Tr. 1299). Additionally, the ALJ considered statements by Neifert's treating therapist, Dr. Nau, made shortly after his accident which concluded he had a mild cognitive impairment resulting in deficits in his working memory, ability to maintain attention, and perform at his prior level of work in the presence of distraction. (Tr. 1174).

Thus, the medical consensus during the relevant period seemed to reiterate what the longitudinal medical record and Neifert's activities of daily living demonstrated: although Neifert suffered from mild cognitive impairments and memory loss, he was largely functional in his daily life, including managing his own autobody shop, and that his view of his limitations was greater than reality.

This medical consensus during the relevant period was cast against a treating source opinion issued some five years after the end of the disability period, which has become the subject of the instant appeal. On April 26, 2021, Dr. Denny John completed a checkbox form assessing Neifert's ability to perform work-related activity. (Tr. 1833-34). Notably, despite Dr. John's treatment of the plaintiff beginning only one month prior, in March 2021, (Tr. 1842), Dr. John stated that his opinions regarding Neifert's ability to perform work-related activity could be

14

applied back as early as December 2012, the alleged onset date. (Tr. 1834). Dr. John

opined that the residual symptoms from Neifert's 2012 traumatic brain injury would

render him completely disabled, stating that he would be absent from work more

than four days per month, would be seriously limited in interacting with others and

maintaining appropriate behaviors, and would be unable to meet competitive

standards in an array of mental abilities including understanding, remembering, and

carrying out detailed instructions, dealing with stress, accepting instructions and

responding appropriately to criticism from supervisors, performing at a consistent

pace, completing a normal workday and work week, making simple work-related

decisions, working in coordination with others, maintaining regular attendance, and

remembering work-like procedures. (Tr. 1833-34). Thus, despite Neifert continuing

to be self-employed managing a body shop throughout the relevant period and

beyond, Dr. John believed he would be totally disabled.

It was against the backdrop of this medical opinion evidence that Neifert's

case came to be considered by an ALJ.

### D. **The ALJ Hearing and Decision**

Neifert's disability claim was heard by the ALJ for a third time on November

22, 2023. (Tr. 1927-47). The ALJ acknowledged the brevity of the hearing, it being

the third time this case had been before the ALJ and noted inconsistencies between the plaintiff's testimony and the prior treatment records. (Tr. 1942).

Following this hearing, on February 23, 2024, the ALJ issued a third unfavorable decision in this case denying Neifert's 2016 application for benefits. (Tr. 1900-20). In that decision, the ALJ first acknowledged that the decision would address the internal inconsistency in his previous decision with regard to the exertional level Neifert was capable of performing which the district court identified as material (Tr. 1903). The ALJ then found that Neifert had last met the insured status requirements of the Act on June 30, 2016, and had not engaged in substantial gainful activity during the relevant period from December 7, 2012, to the date last insured. (Tr. 1905-06). The ALJ acknowledged the plaintiff's testimony that he earned $300-$400 per month going to vehicle auctions and averaged $800 per month working 30 hours per week at his body shop throughout the relevant period, but noted that the reported self-employment income appeared under substantial gainful activity levels and that the record was not sufficient to establish substantial gainful activity under the applicable tests for evaluating self-employment income. (Tr. 1906).

At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Neifert had the following severe impairment: Traumatic Brain

Injury. (Id.)  At Step 3, the ALJ determined that Neifert's impairment did not meet or medically equal the severity of any listed impairments. (Tr. 1906-08) Nonetheless, in so finding the ALJ concluded that Neifert had moderate impairments in all four areas of mental functioning, including understanding, remembering or applying information, interacting with others, concentrating, persisting or maintaining pace, and adapting or managing oneself. (Id.)

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Neifert's limitations from his impairments, stating that:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant must avoid exposure to unprotected heights and dangerous moving machinery. The claimant is limited to work requiring no more than a reasoning level of two, but not performed at a production-rate pace. The claimant is limited to no more than occasional changes in the work setting. The claimant is limited to no more than occasional interaction with supervisors, coworkers and the public.

(Tr. 1909).

Specifically, in making the RFC determination, the ALJ considered the clinical evidence, the medical opinions, and Neifert's self-described activities. With respect to the clinical evidence, the ALJ summarized:

> While these treatment records establish some mental functional limitations through the date last insured and beyond, this medical evidence does not establish greater mental functional limitations than

17

provided above. In addition, the undersigned considered all medical evidence of record, including evidence beginning in October of 2019, long after the date last insured, and nothing in this medical evidence establishes greater functional limitations that would relate back prior to the date last insured.

In sum, after a complete review of the medical records, the objective medical evidence, including diagnostic testing, clinical findings, reports from the claimant and his mother regarding improvement and reports of increased and significant physical and mental activities, do not support and are not consistent with the extreme level of limitation testified to by the claimant and alleged at the hearings in this matter. In this regard, no exertional limitations were provided because of documented normal examination findings shortly after the claimant's injury and based on his reported improvement and level of activity, including returning to work thirty hours a week as a self-employed auto mechanic and as a purchaser at car auctions for a separate business operated by his friend and perform multiple activities of daily living. However, postural and environmental limitations were provided to address any residual symptoms and to prevent potential injury in the workplace. A limitation for the use of a rolling walker and/or cane was not provided as these devices where only initially needed by the claimant and no longer medically necessary shortly after his injury based on the clinical findings of record. In terms of mental limitations, the undersigned considered a moderate limitation in understand, remember or apply information by reducing the claimant to work requiring no more than a reasoning level of 2. The undersigned considered a moderate limitation in interacting with others by reducing the claimant to no more than occasional interaction with people he works with such as coworkers and supervisors and the public. The undersigned considered a moderate level of limitation in the concentrate, persist or maintain pace by limiting the claimant to no production pace work. The undersigned considered a moderate limitation to adapt or mange oneself by reducing the amount of change in the work setting to more than occasional. However, the objective clinical finding and mental testing, along with the activity level of the claimant would not support even greater limitations. As such, the above

residual functional capacity is well supported and consistent with the evidence of record.

(Tr. 1913-14).

The ALJ also concluded that Neifert's statements and activities during the relevant period, including his ability to work 30 hours per week and independently perform all activities of daily living, were inconsistent with the level of impairment he alleged. On this score, the ALJ noted:

> Initially, it is noted that the claimant indicated he follows spoken instructions "ok" and that despite alleged balance issues, he had not fallen during the relevant time period, and that he did not use a cane (Exhibit 6E). The claimant reported that during the relevant time period, he worked thirty hours a week as a mechanic at his own body shop, went to car auctions to purchase cars for his friend's business, drove, including an hour each way to and from therapy once a week, took care of his personal needs, shopped in stores for groceries, managed his finances, performed household chores, and used a computer (to search for things that were for sale, even though he did not use a computer for social media purposes) and smart phone (Exhibit 6E and Hearing Testimony 11/5/18 and 5/5/21). At the current hearing, the claimant testified to being able to drive during the relevant period and that he had lifted cans of paint. The claimant denied he currently goes to car auctions or is working in a car garage, but when asked if he still helps out around the garage, he replied "no, not really", which shows the claimant may be still engaging in some continued activities there. Nevertheless, while not dispositive, the claimant's overall level of activity, especially in relation to the relevant period, is not consistent with his extreme allegations, as stated above. As such, the claimant's statements are given only some weight because they are not entirely supported or consistent with the evidence discussed above. However, the undersigned acknowledges that the claimant had some limitations performing some of these activities, and while none of these activities are alone dispositive, taken together and considered in conjunction with

19

the above medical evidence of record, they suggest that the claimant
was able to perform work within the above parameters on a sustained
and continuous basis through the date last insured.

(Tr. 1915).

The ALJ also considered the medical opinion evidence in fashioning the RFC

for the plaintiff. The ALJ gave great weight to the 2016 opinion of Dr. Freese and,

conversely, afforded little weight to the 2021 opinion of Dr. John that Neifert would

be completely disabled. As to the opinion of Dr. Freese, while the ALJ

acknowledged his opinion was issued in the context of the litigation, he found the

opinion of Dr. Freese was entitled to significant weight because he supported his

opinion with a detailed analysis of the medical records and a discussion of his

examination findings. (Tr. 1917). The ALJ highlighted that, although Dr. Freese

concluded Neifert had reached maximum medical improvement, he characterized

his cognitive and short-term memory issues as "relatively mild" and reiterated that

he has a job that allows him to function independently and was coping reasonably

well. (Id.) The ALJ found this opinion consistent with and supported by the medical

evidence of record including the examination findings in conjunction with Neifert's

statements of improvement and activities of daily living. (Id.)

The ALJ also afforded great weight to the treatment notes of Dr. McLaughlin,

who opined that Neifert could handle basic day to day functions and was able to

return to work doing body work, and Dr. Malantic Lin, who opined Neifert was independent in ambulation without an assistive device, independent in his activities of daily living, and could drive. (Tr. 1916). The ALJ found these opinions were consistent with and supported by the medical evidence regarding Neifert's physical abilities, including full strength and sensation, normal reflexes, and full range of motion. (Id.) The ALJ also noted these opinions were consistent with Neifert's activities of daily living, including his ability to work as a self-employed auto mechanic and purchaser at car auctions, and consistent with his statements of improvement. (Id.)

Conversely, the ALJ afforded the 2021 opinion of treating source Dr. John little weight. The ALJ explained that the medical evidence of record showing full extremity strength, intact sensation, normal reflexes, ability to walk in a straight line/stand on one leg bilaterally and full range of motion, along with memory issues, vertigo, and vision defects being noted as "resolved," did not support the degree of functional limitation opined by Dr. John through the date last insured. (Tr. 1917).

The ALJ also rejected the 2013 opinion of Elaine Nau as a non-acceptable medical source and because it was rendered in the immediate period following the accident and did not account for the plaintiff's cognitive improvements. (Tr. 1916). The ALJ also noted that Nau's opinion did not take into account Neifert's ability to

return to work 30 hours a week. (Id.) The ALJ also gave the opinion of the state agency mental consultant, Dr. Fretz, that there was not enough evidence to make a determination about Neifert's limitations little weight. (Tr. 1917). The ALJ considered the opinion within the context of the great weight given to the opinion of Dr. Freese and concluded that the evidence of record supported the RFC. (Id.)

While not within the context of the evaluation of the medical opinion evidence, the ALJ also rejected the opinion of a single decision-maker (SDM) who opined at the initial stage of Neifert's disability determination that he was only capable of performing light work. (Tr. 103-05). In rejecting this assessment, the ALJ explained that this opinion was from a non-medical source, the assessment was not well explained in terms of objective basis, and was inconsistent with the objective findings, response to treatment, and activity level of the claimant. (Tr. 1915).

Having arrived at this RFC assessment, the ALJ found at Step 4 that Neifert could not return to his past relevant skilled work as an Auto Technician and Auto Body repairer, but determined at Step 5 that there were other jobs which existed in substantial numbers in the national economy which Neifert could perform. (Tr. 1918-19). The ALJ explained that, while he was able to perform work at all exertional levels, Neifert's ability to perform work was compromised by non-exertional limitations. (Tr. 1919). Based upon the testimony of the vocational expert,

the ALJ concluded that Neifert would be capable of performing unskilled work requiring no more than a reasoning level of two, not performed at a production-rate pace, with no more than occasional changes in the work setting. (<u>Id.</u>) Since three positions with significant numbers of jobs in the national economy existed that met these criteria, the ALJ concluded that the plaintiff did not meet the stringent standard for disability set by the Act and denied this claim. (<u>Id.</u>)

This third appeal of the ALJ's decision followed. (Doc. 1). On appeal, Neifert argues that substantial evidence does not support the RFC formulated by the ALJ because no medical opinion supports the limitations set by the ALJ and there was no physical examination supporting the conclusion that he could perform work at all exertional levels. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, and mindful of the deferential standard of review we apply when examining an ALJ decision, we will affirm the decision of the Commissioner.

## III.   <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the

record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency

factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process,

the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other

29

evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C. <u>The ALJ's Decision is Supported by Substantial Evidence.</u>

At the outset, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. Judged against these deferential standards of review, we find that the ALJ's decision that Neifert could perform work at all exertional levels with certain non-exertional limitations is supported by substantial evidence. Therefore, we will affirm this decision.

The plaintiff essentially argues the ALJ's decision was not supported by substantial evidence for two reasons. First, the plaintiff avers that the ALJ cherry-picked evidence in rejecting the opinion of Neifert's most recent treating neurologist Dr. John. Second, the plaintiff argues that no medical opinion supported the mental or physical RFC.

As to the plaintiff's first argument that the ALJ erred in rejecting the opinion of Dr. John, since he was the only medical expert who offered a detailed opinion

concerning Neifert's mental aptitudes relevant to his ability to work, in our view the ALJ's decision to give little weight to the outlier opinion of Dr. John, which was issued five years after the disability period, was both adequately articulated and supported by substantial evidence. On this score, Neifert's case was filed prior to 2017, when the regulations provided that ALJs were to evaluate medical source opinions in correlation with their ties to the claimant. Thus, under this paradigm, treating sources are generally entitled to more weight. See 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. § 404.1502 (defining treating source). But this paradigm which generally entitles treating sources to more weight is also guided by certain legal tenets. First, "[w]here, . . . , the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Moreover, an ALJ may discount a treating source opinion when it conflicts with other objective tests or examination results, Johnson v. Comm'r of Soc. Sec.,

529 F.3d 198, 202–03 (3d Cir. 2008), or "if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016).

Finally, where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c).

Against these legal guideposts, the ALJ's decision to afford the opinion of Dr. John little weight was supported by substantial evidence. First, the ALJ concluded the opinion of Dr. John conflicted with other objective tests or examination results, Johnson, 529 F.3d at 202–03, including objective examination findings showing 5/5 muscle strength in all extremities, intact sensation, normal reflexes, the ability to walk in a straight line/stand on one leg bilaterally and full range of motion in all areas, as well as memory issues, vertigo, and vision deficits being noted to be

34

"resolved." (Tr. 1917). Moreover, "there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton, 184 F. Supp. 3d at 145. Specifically, the opinion of Dr. John, who only began treating the plaintiff one month prior to his opinion being issued in 2021, that Neifert would be unable to sustain fulltime work on a competitive basis and would miss more than four days of work per month, is simply inconsistent with Neifert's demonstrated ability to maintain his autobody shop and work 30 hours per week throughout the entire disability period. Indeed, the record demonstrates that Neifert was independent in his activities of daily living and in managing his business and finances throughout the disability period at issue.[4]

Having properly concluded that Dr. John's opinion was not entitled to controlling weight, the ALJ evaluated the balance of the medical opinion evidence according to the regulations, affording great weight to those opinions which presented relevant evidence to support their medical opinions and explained their conclusions, for example, the detailed opinion of Dr. Freese, and which were consistent with the record as a whole. 20 C.F.R. § 404.1527(c). Thus, the ALJ's

---

[4] It is also worth noting that, in terms of the length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship, Dr. John only began treating Neifert one month prior to issuing his opinion. (Tr. 1860). Thus, his treating relationship was nearly as remote as that of the consultative examiner who examined Neifert and issued his opinion during the relevant period.

analysis of the medical opinion evidence complied with the applicable regulations and was supported by substantial evidence.

As to the plaintiff's twofold argument that the ALJ was required to base the mental and physical RFC upon a medical opinion, as a foundational issue, we note that the ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 360–61 (3d Cir. 2011). Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden v. Colvin, 191 F. Supp. 3d 429, 454 (M.D. Pa. 2016). Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15. Thus, to the extent the plaintiff argues the RFC is not supported by substantial evidence because there was no medical opinion that mirrored the assessment set forth by the ALJ, this argument fails.

Moreover, as to the mental RFC, while the mental limitations in the RFC were not directly pulled from a medical opinion, the ALJ did give great weight to the opinion of the consultative examiner, neurologist Andrew Freese, who opined that

36

Neifert's "relatively mild" cognitive and short-term memory issues were permanent, and he had reached maximum medical improvement at the time of his July 2016 opinion. The ALJ also gave great weight to the notes of treating sources Drs. McLaughlin and Malantic Lin who opined he was able to return to work and handle basic day to day functions and that he could ambulate without and assistive device and was independent in his activities of daily living. As previously discussed, these opinions were entitled to greater weight because they were well explained and supported by and consistent with the longitudinal medical record.

Further, our independent review of the medical record also supports the ALJ's mental RFC assessment in this case. Indeed, Neifert's impairments were characterized as "mild" (Tr. 1174, 1560); by March 2013 he reported he was able to independently manage his finances and his business buying and selling cars, (Tr. 1173), and he continued working thirty hours per week as an autobody mechanic,[5]

_____

[5] While not outcome determinative, courts have weighed a claimant's clear ability to work during the disability period against claimants in credibility determinations regarding their subjective reports of symptoms. See Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *14 (M.D. Pa. Sept. 30, 2015); Sweeney v. Colvin, No. 3:13-CV-02233-GBC, 2014 WL 4294507, at *13 (M.D. Pa. Aug. 28, 2014) (Although she did not work enough to deny her claim at step one, her ability to work this much certainly undermines her claims that she is disabled because of "constant" back pain. SSR 96–7p (The adjudicator must consider "prior work record and efforts to work" and "daily activities" in making a credibility determination)). Indeed, "[a] claimant's ability to maintain part-time employment is a factor relevant to whether she is disabled." Newcomer v. Comm'r of Soc. Sec., No. CIV.A. 14-161J, 2015 WL

(Tr. 1334, 1447-48, 1551); he reported being independent in his activities of daily living, (Tr. 1447-48); and by June 2013 he reported having about 90% return of function. (Tr. 1279). By February 2016, he scored 25/30 on a Mini-Mental Status Exam and stated that he was not interested in continuing with any therapies. (Tr. 1447-48). Further, although he experienced memory deficits, it was reported that his perception of the deficits outweighed those demonstrated on testing and he reported being "stubborn" and not using strategies to compensate for his mild cognitive impairments. (Tr. 1316-17, 1320, 1329). Based upon this record, the ALJ adequately accommodated for Neifert's cognitive limitations by limiting him to work requiring no more than a reasoning level of two, but not performed at production-rate pace, with no more than occasional changes in work setting and no more than occasional interaction with supervisors, coworkers and the public. See e.g. Shoemaker v. Colvin, No. 3:16-CV-2304, 2018 WL 3245011, at *11 (M.D. Pa. Apr. 5, 2018), report and recommendation adopted sub nom. Shoemaker v. Berryhill, No. 3:16-CV-2304, 2018 WL 3239903 (M.D. Pa. July 3, 2018) ("[T]here is no inherent inconsistency between the ALJ's finding that [the plaintiff] could perform . . . tasks

---

1780205, at *6 (W.D. Pa. Apr. 20, 2015) (citing Miller v. Comm'r of Soc. Sec., 524 F. App'x 191, 194 (6th Cir.2013)).

at reasoning level 2 and the ALJ's conclusion that [the plaintiff] faced moderate difficulties in maintaining concentration, persistence and pace.")

Further, under Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting a mental RFC analysis. Instead, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, .... " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

Here, although the ALJ did not specifically rely upon the opinion of a medical expert in fashioning the mental RFC, the ALJ highlighted Neifert's reports of improvement in his cognitive symptoms, cognitive testing showing only mild impairments in many areas of cognition, including memory and concentration, and the expert opinions that Neifert could perform work activities, and his highly independent activities of daily living in fashioning the mental RFC. This met the articulation standard in Hess.

Finally, the ALJ's decision not to include any exertional limitations in the RFC was supported by substantial evidence. On this score, in concluding that Neifert was capable of performing work at all exertional levels, the ALJ explained:

> In this regard, no exertional limitations were provided because of documented normal examination findings shortly after the claimant's injury and based on his reported improvement and level of activity, including returning to work thirty hours a week as a self-employed auto mechanic and as a purchaser at car auctions for a separate business operated by his friend and perform multiple activities of daily living.

(Tr. 1914). Our review of the medical records supports this assessment. In fact, Neifert was able to ambulate independently, (Tr. 1298, 1447-48), was independent in his activities of daily living, (Tr. 1447-48), and was working thirty hours per week as an autobody mechanic. (Tr. Tr. 1334, 1447-48, 1551). Neifert even reported in April 2013 he was not having as much trouble walking on uneven surfaces and was able to go up on a ladder, go up on a roof, cut grass, and weed whack. (Tr. 1162). Indeed, the only evidence of physical impairment was the plaintiff's reports of dizziness and balance issues, which appeared to be improving by June 2013, (Tr. 1142, 1149), but that the ALJ accounted for in the RFC which dictated "the claimant must avoid exposure to unprotected heights and dangerous moving machinery." (Tr. 1909).[6] There was no error here.

---

[6] Moreover, the ALJ's decision to reject the opinion of the state agency single decision-maker (SDM) who evaluated his case at the initial level and concluded he

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.    <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

---

was only capable of light work was proper since, "Courts have observed that a SDM is not a medical professional, and that such opinions are entitled to no evidentiary weight." Naomi Rodriguez v. Berryhill, No. 1:18-CV-684, 2019 WL 2296582, at *3 (M.D. Pa. May 30, 2019) (citing Yorkus v. Astrue, No. 10–2197, 2011 WL 7400189, at *4 (E.D. Pa. Feb. 28, 2011); Bryant v. Colvin, No. 4:14-CV-981, 2015 WL 1401001, at *4 (M.D. Pa. Mar. 26, 2015)).

An appropriate order follows.

_s/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED: December 11, 2025